NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

AMBER M., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.M., K.M., C.M., *Appellees*.

No. 1 CA-JV 19-0031
FILED 8-8-2019

Appeal from the Superior Court in Maricopa County
No.  JD 529981
The Honorable David B. Gass, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Laurie Blevins
*Counsel for Appellee, DCS*

---

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Samuel A. Thumma joined.

---

**B R O W N**, Judge:

¶1        Amber M. ("Mother") appeals the juvenile court's order terminating her parental rights to her children—A.M., born in 2008, K.M., born in 2012, and C.M., born in 2014 (collectively, "the children").[1] The only issue before us is whether the court's diligent efforts finding regarding the provision of appropriate reunification services is supported by reasonable evidence.  For the following reasons, we affirm.

### BACKGROUND

¶2        Between February 2013 and March 2016, the Department of Child Safety ("DCS") received several reports alleging Mother was abusing and neglecting the children, two of whom have special needs.  In May 2016, DCS received additional reports alleging Mother had physically abused K.M.  When a daycare worker received a report that Mother hurt K.M. by hitting her on the back with a cord, the worker notified DCS.  A forensic investigator then received a report that Mother hit the children with her fists, cords, and a paddle; the report described the hitting as "really bad." Soon thereafter, DCS removed the children from the home and filed a dependency petition, alleging the children were dependent as to Mother due to abuse, neglect, and Mother's untreated mental health issues.

¶3        When DCS removed the children from the home, Mother was enrolled in counseling at Focused Family Services ("FFS").  In June 2016, Mother participated in a psychological evaluation with Dr. G. Joseph Bluth, who diagnosed her with some "Unspecified Bipolar and Related Disorder[s]" and post-traumatic stress disorder.  Bluth was doubtful that Mother could properly parent her children and opined that Mother's ability to demonstrate minimally adequate parenting skills in the foreseeable future was "guarded to poor" because her mental health condition causes her to be sensitive to stress in her life—something that could be triggered

---

[1]        Each of the children has a different father.  The fathers' parental rights were also terminated, but they are not parties to this appeal.

by parenting a child with special needs. Bluth also opined there may be a risk of neglect and abuse given Mother's history of abuse as well as concerns regarding her ability to provide for and care for the children without a great deal of assistance from others. Bluth did, however, recommend that Mother could benefit from a psychiatric evaluation, counseling, anger management skills training, and parenting training.

¶4        As reflected in a September 2016 dependency mediation order, it was agreed that DCS would offer Mother the following services: parent aide, psychological evaluation, psychiatric evaluation, parenting classes, and anger management. As to counseling services, the parties agreed that Mother had "self-referred." The court found the children dependent as to Mother in December 2016 and approved a case plan of family reunification. In April 2018, the court approved changing the case plan to severance and adoption. DCS then moved to terminate Mother's parental rights, alleging the children had been in an out-of-home placement for more than 15 months, Mother had not remedied the circumstances that caused the placement, and the lack of Mother's behavior changes made it unlikely she could properly parent in the near future. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(8)(c).

¶5        The juvenile court conducted a termination hearing, receiving testimony from Mother, a DCS case manager, Dr. Bluth, and Dr. James Thal, who performed a bonding and best-interests assessment. In a detailed minute entry, the court granted DCS's motion, finding that Mother was not credible and "continues to lack insight into the skills she needs to care for the children" due in large part to her failure to fully participate in services and because she "does not have a fundamental understanding of what she needs to do as a parent of children who have special needs." The court further emphasized that Mother prematurely stopped treatment in programs designed to help her. This timely appeal followed.

## DISCUSSION

¶6        To terminate parental rights, the juvenile court must find, by clear and convincing evidence, the existence of at least one statutory ground for termination enumerated in A.R.S. § 8-533(B). *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). As a necessary element to overcome a parent's fundamental right to custody of his or her child, the court must also find that DCS made diligent efforts to provide appropriate reunification services before it can terminate parental rights under A.R.S. § 8-533(B)(8)(c). *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 32 (App. 1999).

**¶7**          DCS must provide services and give the parent an opportunity to engage in the services, *id.* at ¶ 37, but it is not required to wait an indefinite period before requesting termination of parental rights, *Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). Nor is DCS required to provide services that would be futile or ensure parents participate in the services offered; however, DCS must at least provide "the parent[s] 'with the time and opportunity to participate in programs designed to help [them] to become an effective parent.'" *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶¶ 14–15 (App. 2011) (citation omitted). DCS does not meet its obligation, however, "when it neglects to offer the very services that its consulting expert recommends." *Mary Ellen C.*, 193 Ariz. at 192, ¶ 37. We will accept the court's findings of fact unless no reasonable evidence supports them. *Christina G.*, 227 Ariz. at 234, ¶ 13.

**¶8**          Mother challenges only the juvenile court's finding that DCS made a diligent effort to provide appropriate reunification services, arguing DCS failed to timely and adequately provide counseling—a family reunification service recommended by Dr. Bluth. Specifically, Mother challenges DCS's nine-month delay in referring her to counseling services between February 2017, after she informed DCS she had stopped attending FFS, and October 2017, when DCS referred her to counseling at Arizona Center for Change ("ACC"). DCS counters, in part, that Mother waived her ability to challenge DCS's efforts at reunification services because she failed to object in the juvenile court. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 16 (App. 2014).

**¶9**          The juvenile court found Mother did not challenge the adequacy of services provided or offered by DCS until "the end of the process" and that the record establishes both reasonable and diligent efforts on the part of DCS to effectuate reunification of Mother and the children. Although the record shows that Mother raised the issue of services during at least two review hearings and filed a motion asking the court to find DCS failed to make diligent efforts to provide Mother reunification services, these objections were made in 2016, at a time when she was attending FFS. Nothing in the record indicates that Mother objected to the court's reasonable efforts findings during the nine-month gap when she was not offered counseling, even though Mother attended three report and review hearings in that time period. *See id.* at 178, ¶¶ 13–14 (explaining a parent dissatisfied with the adequacy of services can raise an objection in many ways, including at a pre-hearing conference, at a preliminary hearing, or at periodic report and review hearings).

¶10      We recognize that Mother's counsel objected to the juvenile court's diligent efforts finding at the end of the first day of the termination hearing, but that related only to an October 2018 counseling referral.  We also recognize that counsel raised concerns during closing arguments of the termination hearing about DCS's nine-month delay in referring Mother to counseling, claiming she was left "high and dry" due to the delay.  But this objection, made at the very end of the hearing and raised approximately two years after her self-referred counseling was discontinued, cannot be reasonably construed as a timely objection because it did not give the court a reasonable opportunity to address the matter.  *See id.* at ¶ 18 (explaining that if mother thought DCS "was not making diligent efforts to provide appropriate reunification services at any point, it was incumbent on her to promptly bring those concerns to the attention of the juvenile court, thereby giving that court a reasonable opportunity to address the matter and ensure that [DCS] was in compliance with its obligation to provide appropriate reunification services as ordered").  Thus, Mother has waived the issue of whether DCS made diligent efforts to provide appropriate counseling based on the nine-month gap that occurred in 2017 due to DCS's failure to timely submit a referral.  *See id.* at ¶ 16 (noting the termination process "demands that parents voice their concerns about services to the juvenile court in a timely manner").

¶11      Waiver aside, any delay caused by DCS does not mean the court's termination order is legally deficient.  Instead, after consideration of all the circumstances in this record relating to diligent efforts, we conclude that DCS offered Mother reunification services that would reasonably allow her the time to become an effective parent.

¶12      The juvenile court made specific findings for a variety of services to Mother.  Significantly, the court found that Mother's explanation for her failure to participate in counseling with ACC was not credible and that her participation in services with FFS was sporadic.  The court also found Mother continued to lack the insight into the skills she needed to care for the children, due in large part to her failure to fully participate in the offered services.  As a result, the court found Mother had not resolved the issues that led to the children being in DCS custody and it was substantially unlikely she would be able to resolve them in the foreseeable future.  These findings are supported by the record.

¶13      We first note that Mother had extensive involvement with DCS before this case.  DCS received approximately 17 reports of physical abuse and neglect involving Mother and her children dating back to 2006, and in December 2010, the juvenile court terminated her parental rights to

5

her older child (born in 2005) under the same ground and an additional ground of Mother's mental illness. *See* A.R.S. § 8-533(B)(3). During the prior dependency, DCS offered Mother counseling services at Terros, transportation, drug testing, two psychological evaluations, parenting skills classes, and a parent aide. Mother declined services at Terros and instead chose a separate counseling service where she failed to timely complete the program offered. The court found Mother was provided with the time and opportunity to participate in appropriate services to reunify her with her child and that providing further services would be futile.

¶14 As to this termination proceeding, DCS began providing Mother with services in June 2016. Case manager Destenie Staples testified that the services were intended to assist Mother in making behavioral changes and informed her she would need to show such changes by "[developing] an increased understanding of child development and milestones, especially with children with high needs; implementing nonphysical discipline and appropriately addressing concerns and cues by the children; maintaining stable housing, as well as employment; identifying suitable caregivers; and gaining insight into how her actions have negatively impacted her children." Dr. Bluth recommended that Mother should participate in services including continued counseling, a psychiatric evaluation, and an ongoing evaluation of Mother's parenting skills. Mother testified that she participated in some services with DCS in connection with this dependency, but acknowledged she was not fully compliant.

¶15 Mother's participation in counseling started to decline in 2017. Mother self-referred to counseling services at FFS, where she was participating when the case began. Mother notified DCS in February 2017 she had stopped attending counseling sessions at FFS due to scheduling issues with her employer. After Mother reported to DCS that she was unable to continue attending counseling sessions at FFS, DCS referred her to ACC for individual counseling in November 2017. DCS did not provide an explanation for the nine-month delay in referring Mother to ACC. Though the unexplained delay is striking, we do not find it prejudiced Mother because once she was finally referred for individual counseling, her participation at ACC was almost nonexistent. After Mother's first intake appointment at ACC, she attended only one subsequent appointment and either canceled or failed to attend her other appointments. Mother was closed out of ACC for failing to attend and communicate her absences. She returned to FFS in February 2018. In October 2018, Mother emailed her caseworker informing her she was leaving FFS because her insurance lapsed. That same month, Mother requested an additional counseling

referral, and DCS implemented the counseling referral approximately three weeks later.

¶16 Despite Mother's sporadic participation in counseling, we reject her contention that DCS failed to provide her services recommended by Dr. Bluth by waiting nine months to give her a referral for additional counseling after she stopped attending FFS in February 2017. Although we are troubled by DCS's lack of an explanation for the nine-month delay, once Mother was assigned to ACC, she failed to adequately participate, and the court found her explanation for doing so lacked credibility. DCS "is not required to . . . ensure that a parent participates in each service it offers." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). Moreover, DCS provided Mother with a variety of other services for more than two years. Its decision to not wait longer to see whether Mother would fail to participate in subsequent services does not render its efforts unreasonable.

¶17 Mother also challenges the juvenile court's finding that services from FFS "were not at the level necessary to address the concerns raised in this matter." The court noted that FFS provided primarily group therapy, not higher-level, focused individual therapy and that Mother "participated in those [FFS] services sporadically." Mother argues, with some force, it was "fundamentally unfair for the court to wait until it filed its termination order to communicate to Mother that it thought the [FFS] counseling was inadequate." Not surprisingly, a termination hearing may provide the court more detail about services provided than at intermediate hearings, which may explain the basis for the court's conclusion about FFS counseling after trial. The record does not explain why the court made the finding about FFS counseling, and, if FFS was the only entity providing counseling services to Mother, this finding would have significantly undercut the court's ultimate conclusion that DCS provided appropriate reunification services. That said, the trial record shows that DCS referred Mother for counseling services through ACC a year before the court granted termination, that she failed to participate in that counseling in a way that altered her behavior—and in fact only attended at most two sessions after her intake before cancelling or failing to attend the rest—and that her explanation for that failure was not credible. Mother also reported to her counselors that she was attending FFS because she was "referred by her DCS worker to complete individual counseling," showing Mother was aware DCS required her to participate in individual counseling. Mother attended a few individual counseling sessions at FFS, but mainly attended group sessions, despite her acknowledgment to counselors that DCS required individualized counseling. For these reasons, any inaccuracy or

error in the court's findings regarding FFS counseling did not result in the court erroneously concluding DCS provided appropriate reunification services.

**¶18**      Based on this record, reasonable evidence supports the juvenile court's finding that DCS made diligent efforts to provide Mother with reunification services.

## CONCLUSION

**¶19**      The juvenile court's order terminating Mother's parental rights is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA